# IN THE SUPREME COURT OF IOWA

No. 11–0449

Filed July 5, 2013

**STATE OF IOWA** ex rel. **THOMAS J. MILLER,**
Attorney General for Iowa,

    Appellee,

vs.

**VERTRUE, INCORPORATED** f/k/a MEMBERWORKS, INC., a Delaware Corporation; **ADAPTIVE MARKETING, LLC,** a Delaware Limited Liability Company; **IDAPTIVE MARKETING, LLC,** a Delaware Limited Liability Company,

    Appellants.

---

Appeal from the Iowa District Court for Polk County, Robert A. Hutchison, Judge.

Seller of buying club memberships appeals the district court's rulings that its solicitation and business practices violated the buying club membership law and the consumer fraud act. The State cross-appeals. **AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED.**

Mark McCormick and Margaret C. Callahan of Belin McCormick, P.C., Des Moines, and Jeffrey R. Babbin and Kim E. Rinehart of Wiggin and Dana LLP, New Haven, Connecticut, for appellants.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Deputy Attorney General, and Steven M. St. Clair and Julia S. Kim, Assistant Attorneys General, for appellee.

**CADY, Chief Justice.**

In this appeal and cross-appeal, we must consider numerous issues in an action brought by the Attorney General of Iowa against Vertrue Incorporated alleging violations of the Buying Club Membership Law (BCL), pursuant to Iowa Code chapter 552A (2005), and the Iowa Consumer Fraud Act (CFA), pursuant to Iowa Code section 714.16. The State also sought civil penalties for consumer frauds committed against the elderly pursuant to Iowa Code section 714.16A. The district court found: (1) a number of Vertrue's marketing and sales practices violated the BCL and the CFA, (2) application of the BCL to Vertrue's solicitation practices did not violate the dormant Commerce Clause, and (3) Vertrue did not commit consumer frauds against the elderly in violation of section 714.16A. The court entered judgment awarding $25,250,736.19 in consumer reimbursement for fees paid in connection with memberships sold in violation of the BCL or CFA, civil penalties in the amount of $2,820,000, and $725,240.05 in attorney fees and costs. On our review, we affirm the judgment of the district court in part, reverse in part, and modify the judgment.

## I. Factual and Procedural Background.

Vertrue sells memberships in buying programs that give members the option to purchase various goods and services at discounted rates. Since 1989, Vertrue has enrolled 863,970 Iowans in membership programs. To entice membership into the programs, Vertrue frequently offered gift cards and other "cash back" rewards. Further, Vertrue consistently offered consumers free trial memberships with a negative option—meaning consumers would be charged the full price of the membership if they failed to call and cancel within the designated trial period. Normally, once individuals were enrolled in one of Vertrue's

membership programs, their credit cards or bank accounts were charged on a monthly basis until they contacted Vertrue and canceled the membership.

In 1999, the Consumer Protection Division (CPD) of the Iowa Attorney General's Office began receiving a high volume of complaints from Iowans regarding Vertrue's marketing and business practices. In response to these complaints, the CPD commenced an investigation in December 2004 to assess the legality of Vertrue's business practices. As part of the investigation, the CPD sent approximately 400 written surveys to Iowans who had been enrolled in one of four membership programs offered by Vertrue since April 1, 2003. Of the eighty-eight survey respondents, sixty-seven percent indicated they were either unaware of their membership or did not authorize the membership charges, or both. None of the survey respondents indicated consumer satisfaction.

Based in part on the results of the CPD investigation, on May 12, 2006, the Attorney General initiated this action against Vertrue alleging violations of the BCL and the CFA. The State sought consumer restitution, injunctive relief, and civil penalties under both the BCL and the CFA, and additional civil penalties for consumer frauds committed against the elderly pursuant to Iowa Code section 714.16A.

The State subsequently filed an amended petition to add Vertrue affiliates, Adaptive Marketing, LLC and Idaptive Marketing, LLC, as well as West Telemarketing Corporation and West Corporation, as defendants. The West defendants later settled and were dismissed from the litigation. The remaining defendants, Vertrue, Adaptive, and Idaptive (collectively Vertrue)[1] filed an answer to the State's amended petition

---

[1]Adaptive is a wholly owned subsidiary of Idaptive, which is a wholly owned subsidiary of Vertrue.

denying liability under the BCL and CFA. Vertrue asserted counterclaims requesting declaratory orders establishing the legality of its sales practices under the BCL and CFA. Additionally, Vertrue sought a declaratory judgment establishing that application of the BCL to its mail, telephone, and Internet solicitations would violate the dormant Commerce Clause of the United States Constitution.

The district court bifurcated trial. The first phase addressed the issue of liability. The district court reaffirmed its previous summary judgment rulings and held the BCL was applicable to Vertrue's mail, telephone, and Internet solicitations and that these solicitations violated the BCL. The district court further held that application of the BCL to Vertrue's solicitations did not violate the dormant Commerce Clause. Additionally, the district court concluded several of Vertrue's marketing and business practices constituted unfair practices and deceptive acts under the CFA. However, the court found the BCL did not apply to Vertrue's financial, privacy, or health membership programs, and the State was not entitled to additional civil penalties for consumer frauds committed against the elderly.

During the remedies phase of the trial, the district court interpreted Iowa Code section 714.16(7) to require the State to prove reliance, damages, intent to deceive, and knowledge of falsity in order to obtain a consumer reimbursement award for both the BCL and CFA violations. The court found the State proved ninety percent of Iowa consumers would have canceled Vertrue's programs had they received BCL-compliant disclosures and accordingly ordered consumer reimbursement of ninety percent of Vertrue's net revenues from non-BCL-compliant solicitations. This figure amounted to $22,715,073.65. An additional $2,535,662.54 was awarded for CFA violations, making the

total reimbursement award $25,250,736.19. The court also awarded a total of $2,820,000 in civil penalties for the BCL and CFA violations and $725,240.05 for costs and attorney fees. Finally, the court entered various injunctive orders requiring Vertrue to comply with the provisions of the BCL and CFA.

Vertrue appealed. It claimed the district court erred in finding the BCL applied to its mail, telephone, and Internet sales; the application of the BCL to Vertrue's mail, telephone, and Internet sales did not violate the dormant Commerce Clause; there was sufficient evidentiary support for the BCL reimbursement award and such an award was equitable; there was sufficient evidence of the CFA violations regarding Vertrue's telemarketing solicitations and sufficient evidence for the respective reimbursement award; and there was sufficient evidence to support a CFA reimbursement award for the practice of requiring dual cancellation requests for memberships bundled into a single Internet transaction.

The State cross-appealed. It argued the district court erred in finding the record did not support an award of additional civil penalties for consumer frauds committed against the elderly; the BCL did not apply to Vertrue's financial, privacy, and health programs; a BCL reimbursement award requires proof of reliance, damages, intent to deceive, and knowledge of falsity; a reimbursement reward for a CFA claim of concealment, suppression, or omission of a material fact requires proof of reliance, damages, intent to deceive, and knowledge of falsity; and there was insufficient evidence of reliance, damages, intent to

deceive, and knowledge of falsity to support a finding of a CFA violation for Vertrue's "breakage" practices.[2]

## II. Application of the Buying Club Membership Law.

**A. Scope of Review.** Our review of this equity ruling is de novo; however, we review the district court's interpretation of chapter 552A for correction of errors at law. *See Iowa Film Prod. Servs. v. Iowa Dep't of Econ. Dev.*, 818 N.W.2d 207, 217 (Iowa 2012). We also review de novo the district court's ruling on questions of constitutional law. *Homan v. Branstad*, 812 N.W.2d 623, 628–29 (Iowa 2012). In reviewing a challenge under the dormant Commerce Clause of the United States Constitution, "[o]ur function is to determine, to the best of our ability, how the United States Supreme Court would decide this case under its case law and established dormant Commerce Clause doctrine." *KFC Corp. v. Iowa Dep't of Revenue*, 792 N.W.2d 308, 322 (Iowa 2010). Thus, we do not "engage in independent constitutional adjudication" or "seek to improve or clarify Supreme Court doctrine." *Id.*

**B. Preservation of Error.** The State contends Vertrue's proposed interpretation of section 552A.3, as well as its dormant Commerce Clause claim, were not properly preserved for appeal. Our error preservation rules provide that error is preserved for appellate review when a party raises an issue and the district court rules on it. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Vertrue clearly presented to the district court the issue of whether section 552A.3 applied to solicitations that were not made in person. The record demonstrates the parties debated the "irrespective of the place or manner of sale" clause of

---

[2]Breakage refers to the business practice of intentionally imposing needless barriers to the consumer's receipt of the free premiums offered to induce membership enrollment.

section 552A.3 at length and the district court rejected Vertrue's interpretation. Moreover, the State acknowledges that "the court ruled the BCL did not violate the Commerce Clause [and] Vertrue filed a motion to reconsider." Accordingly, we conclude Vertrue has properly preserved error on both of these arguments.

**C. Statutory Framework.** In 1993, our legislature enacted the BCL to protect consumers by regulating the sale of buying club memberships. *See* 1993 Iowa Acts ch. 60, §§ 1–5 (codified at Iowa Code §§ 552A.1–.5 (Supp. 1993)).[3] The Act essentially regulates membership sales in two ways. It imposes duties and restrictions on merchants of buying club memberships and establishes public and private remedies for violating its terms. *See* Iowa Code §§ 552A.3–.5 (2005). The section at issue incorporates the disclosure and notice requirements of the Iowa Door-to-Door Sales Act (DDSA). *See id.* § 552A.3. It provides:

> The requirements of sections 555A.1 through 555A.5, relating to door-to-door sales, shall apply to sales of buying club memberships, irrespective of the place or manner of sale or the purpose for which they are purchased. In addition to the requirements of chapter 555A, a contract shall not be enforceable against a person acquiring a membership in a buying club unless the contract is in writing and signed by the purchaser.

*Id.*; *see also id.* §§ 555A.1–.6 (regulating door-to-door sales).

The DDSA imposes numerous requirements on door-to-door sales. Notably, the DDSA requires sellers to provide buyers with a copy of the completed written contract at the time of execution and further requires that the contract include a statement written in large boldface print

---

[3]Prior to 1993 sellers of buying club memberships were not subject to special regulation. Such sellers were required to apply for a "certificate of authority" to do business from the insurance commissioner. Iowa Code § 503.5 (1993). If "satisfied that the business [wa]s not in violation of the law, or against public policy, and that the certificate or contract [wa]s in proper form," the commissioner was authorized to issue the certificate of authority. *Id.*

advising the buyer of the right to cancel the transaction within three business days. *Id.* § 555A.2. A more detailed notice explaining the right to cancel must be attached to the contract. *Id.* § 555A.3. The DDSA also imposes an obligation to supplement the written right to cancel with an oral statement of the right at the time the contract is signed. *Id.* § 555A.4. The legislature enacted the DDSA in 1973 because home solicitation sales can often involve unfair, high pressure tactics. *See* 1973 Iowa Acts ch. 291, §§ 1–6 (codified at Iowa Code §§ 713B.1–.6 (1975) (current version at Iowa Code §§ 555A.1–.6)).

**D. Statutory Interpretation.** Vertrue's argument rests on the premise that section 552A.3's notice and disclosure requirements can only be accomplished by in-person conduct. Vertrue asserts that many of the DDSA requirements as incorporated by the BCL would be impracticable or impossible to perform by merchants who sell buying club memberships by mail, telephone, or the Internet. For example, Vertrue points out that a merchant who uses the mail or Internet to make a sale cannot orally inform the buyer of the right to cancel. Likewise, Vertrue points out that a merchant who uses the telephone to negotiate a sale of a buying club membership cannot hand the seller a copy of the contract. Consequently, Vertrue asserts the legislature only intended section 552A.3 to apply to in-person sales of buying club memberships.

The State, by contrast, asserts that section 552A.3 operates to make the incorporated DDSA notice and disclosure requirements applicable to all buying club membership sales, regardless of the place or means employed in the transaction. The State adds that section 552A.3 can be satisfied by supplementing direct mail and Internet transactions with coordinated telephone contact and the transfer of documents by

mail or facsimile. It further points out that Internet transactions can be supplemented with telephone messages and electronic signatures.

Our obligation is to interpret the statute based on the language used by our legislature. *See Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004) ("We determine legislative intent from the words chosen by the legislature, not what it should or might have said."). Here, the statute provides specific directions. It provides that the requirements for door-to-door sales "apply to sales of buying club memberships, *irrespective of the place or manner* of sale." Iowa Code § 552A.3 (emphasis added). Section 552A.3 of the BCL is not the first occasion our legislature has had to use the phrase "irrespective of the place or manner of sale." It used this same phrase in the definitions section of the DDSA to enlarge the scope of the DDSA requirements in the sale of funeral services and merchandise, as well as the sale of social referral services. *Id.* § 555A.1(3)(*b*). Under this section, the requirements for door-to-door sales apply to the sale of funeral services and merchandise and social referral services "irrespective of the place or manner of sale." *Id.* Thus, sales in these two areas must follow the DDSA requirements even though the DDSA technique is not used. Yet, we have not had an occasion to interpret the phrase.

It is clear our legislature has defined a door-to-door sale in the context of "place" and "manner." The "manner" must involve a personal solicitation of a sale by the seller or the seller's representative, including sales in response to an invitation by a buyer. *Id.* § 555A.1(3)(*a*). The "place" is limited to "a place other than the place of business of the seller." *Id.* Thus, when the legislature declares DDSA requirements apply to buying club membership sales "irrespective of the place or manner," it is declaring the requirements apply without regard to the

"place" or "manner" that define door-to-door sales. In other words, the requirements of the DDSA apply to sales at the "place" of the business of the seller and to sales transacted in a "manner" that is not restricted to in-person solicitation.

Vertrue accurately described some of the difficulties it will encounter in attempting to transact its buying club membership sales by mail, telephone, and the Internet when it is required to follow consumer protection practices developed for person-to-person transactions. Yet, we must focus on the clear language of the statute to direct the outcome, not the difficulty of compliance under a particular business model. Thus, we conclude the trial court properly interpreted section 552A.3 to apply the requirements of the DDSA to the selling of all buying club memberships.

**E. The Dormant Commerce Clause.** Vertrue contends that even if the BCL applies to its mail, telephone, and Internet transactions, it does so in violation of the Commerce Clause of the United States Constitution. Since compliance with the BCL is "unworkable" unless the buying club membership transaction occurs in person, Vertrue maintains the BCL discriminates against out-of-state sellers— unconstitutionally favoring sellers who establish a physical presence in Iowa, thereby investing in Iowa employees and facilities.

The United States Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause "has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of congressional authority." *Fulton Corp. v. Faulkner,* 516 U.S. 325, 330, 116 S. Ct. 848, 853, 133 L. Ed. 2d 796, 804 (1996). The limitation on state regulatory powers—termed the "dormant Commerce Clause"—" 'prohibits economic

protectionism—that is, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." ' " *Id.* (quoting *Associated Indus. of Mo. v. Lohman,* 511 U.S. 641, 647, 114 S. Ct. 1815, 1820, 128 L. Ed. 2d 639, 646 (1994)). Thus, "the [Commerce] Clause is both a 'prolific sourc[e] of national power and an equally prolific source of conflict with legislation of the state[s].' " *Kassel v. Consol. Freightways Corp. of Del.,* 450 U.S. 662, 669, 101 S. Ct. 1309, 1315, 67 L. Ed. 2d 580, 586 (1981) (quoting *H. P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534, 69 S. Ct. 657, 663, 93 L. Ed. 865, 872 (1949)).

Modern dormant Commerce Clause jurisprudence is principally concerned with effectuating

> the Framers' purpose to "preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear."

*Fulton,* 516 U.S. at 330–31, 116 S. Ct. at 853, 133 L. Ed. 2d at 805 (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 180, 115 S. Ct. 1331, 1335–36, 131 L. Ed. 2d 261, 268 (1995)). The United States Supreme Court has adopted a two-tiered approach to analyzing state economic interest regulation pursuant to the dormant Commerce Clause:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552, 559–60 (1986) (citations omitted)).  The party challenging the constitutionality of the statute bears the burden of demonstrating the statute discriminates either on its face or in practical effect.  *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S. Ct. 1727, 1736, 60 L. Ed. 2d 250, 262 (1979).

If the challenger demonstrates that the restriction on interstate commerce is discriminatory, a "virtually *per se* rule of invalidity" applies—even if the restriction is related to a legitimate local purpose.  *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 & n.6, 112 S. Ct. 2009, 2015 & n.6, 119 L. Ed. 2d 121, 133 & n.6 (1992) (citation and internal quotation marks omitted).  In order to validate such a statute, the government carries the heavy burden of proving the regulation "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."  *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278, 108 S. Ct. 1803, 1810, 100 L. Ed. 2d 302, 311 (1988).

On the other hand, if the law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 847, 25 L. Ed. 2d 174, 178 (1970).  In this context, the challenger carries the burden of proving excessiveness.  *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 313 (1st Cir. 2005).  In evaluating a regulation's putative local benefits, the court proceeds with deference to legislative judgments.  *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92, 107 S. Ct. 1637, 1651 95 L. Ed. 2d 67, 87 (1987).  However, a law

"designed for [a] salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Kassel*, 450 U.S. at 670, 101 S. Ct. at 1316, 67 L. Ed. 2d at 587.

With these principles in mind, we turn to the task of evaluating the constitutionality of section 552A.3. Initially, we note section 552A.3 is not facially discriminatory—it does not reference interstate commerce or interstate interaction. Instead, it regulates in an evenhanded manner by applying the notice and disclosure requirements to *any* seller of "memberships" to a "buying club," as those terms are defined in section 552A.1, "without regard to whether . . . the sellers are from outside the State." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471–72, 101 S. Ct. 715, 728, 66 L. Ed. 2d 659, 674 (1981); *see also* Iowa Code §§ 552A.1, .3. Moreover, section 552A.1 does not set forth a definition limited to interstate sellers of buying club memberships, nor does it exclude local sellers. *See* Iowa Code §§ 552A.1–.2.

We acknowledge compliance with the requirements of section 552A.3 for contemporaneous written and oral obligations at the time of the transaction may be difficult for out-of-state sellers with no in-state presence. Yet, the restrictions at issue place the same burden on all sellers using the telephone, mail, or Internet to transact a sale in Iowa.[4] *See SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 n.3 (2d Cir. 2007). *But see Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354–55, 71 S. Ct. 295, 298–99, 95 L. Ed. 329, 333–34 (1951) (holding a Madison,

---

[4]The burdens on these sales hardly render them impossible. Numerous business transactions that formerly were conducted in person are now conducted by other methods. Technological evolution has changed the methods of doing business, including the presentation and signing of documents. Furthermore, Internet communication and transfer of documents can be supplemented by telephone communications to satisfy required oral communications.

Wisconsin, ordinance was unconstitutional because it had the practical effect of excluding "from distribution in Madison wholesome milk produced and pasteurized in Illinois"). "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126, 98 S. Ct. 2207, 2214, 57 L. Ed. 2d 91, 100 (1978).

Section 552A.3 does not afford Iowa sellers a competitive advantage or cause out-of-state sellers to "surrender whatever competitive advantages they may possess." *Brown-Forman*, 476 U.S. at 580, 106 S. Ct. at 2085, 90 L. Ed. 2d at 560. Therefore, we cannot conclude that section 552A.3 has the practical effect of discriminating against out-of-state economic interests.

As a result, the dormant Commerce Clause claim asserted by Vertrue devolves into a question of whether the indirect, incidental burdens imposed on interstate commerce by section 552A.3 are "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S. Ct. at 847, 25 L. Ed. 2d at 178. The protection of consumers and the curtailment of unfair business practices have long been recognized as significant interests in determining whether statutory regulations violate the Commerce Clause. *See CTS*, 481 U.S. at 93, 107 S. Ct. at 1652–53, 95 L. Ed. 2d at 88 (finding no violation of the dormant Commerce Clause and noting Indiana's statute regulating corporate takeovers served the "substantial interest in preventing the corporate form from becoming a shield for unfair business dealing"); *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 649 (6th Cir. 2010) (holding that burdens placed on interstate commerce by Ohio milk labeling regulation did not outweigh the consumer protection benefits); *Allstate Ins. Co. v.*

*Abbott*, 495 F.3d 151, 161–62 (5th Cir. 2007) (holding that Texas statute restricting ability of auto insurers to operate body shops did not violate dormant Commerce Clause because, despite "stray protectionist remarks," the legislative record demonstrated legislation was enacted to protect consumers from predatory insurance practices); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 38–40 (1st Cir. 2005) (holding that burden on interstate commerce from Maine statute prohibiting automobile manufacturers from recovering warranty repair costs for which manufacturers were required to reimburse automobile dealers did not outweigh the state's interest in protecting residents from "frauds, impositions and other abuses" (citation and internal quotation marks omitted)). Furthermore, "because consumer protection is a field traditionally subject to state regulation, '[w]e should be particularly hesitant to interfere with the [State's] efforts under the guise of the Commerce Clause.' " *SPGGC*, 505 F.3d at 194 (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344, 127 S. Ct. 1786, 1796, 167 L. Ed. 2d 655, 668 (2007)).

Notwithstanding, Vertrue argues the burdens are clearly excessive because the record does not contain any *actual* evidence of consumer protection benefits. However, "under *Pike*, it is the *putative* local benefits that matter. It matters not whether these benefits actually come into being at the end of the day." *Pharm. Care*, 429 F.3d at 313. Furthermore, Vertrue has not identified any substantial impediments on interstate commerce that outweigh the consumer protection benefits. We acknowledge the minimal burden section 552A.3 imposes on the interstate sale of buying club memberships in the form of compliance costs. Nevertheless, even a burdensome regulation does not necessarily violate the dormant Commerce Clause because it affects the profits of

individual sellers. "[T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon,* 437 U.S. at 127–28, 98 S. Ct. at 2215, 57 L. Ed. 2d at 101. Under a contrary interpretation, "almost every state consumer protection law would be considered 'protectionist' in a sense prohibited by the Constitution." *SPGGC,* 505 F.3d at 194–95 (holding that Connecticut Gift Card Law prohibiting in-state sales of gift cards with inactivity fees and expiration dates did not regulate out-of-state commerce in violation of dormant Commerce Clause, even though out-of-state sellers necessarily incurred compliance costs).

Based on the preceding, we affirm the district court's conclusion that section 552A.3 does not violate the dormant Commerce Clause.

**F. Applicability of the BCL to Vertrue's Financial, Privacy, and Health Membership Programs.** The State cross-appealed the district court's ruling regarding the applicability of the BCL to Vertrue's sales of financial, privacy, and health membership programs. In its posttrial brief, the State argued any membership that offers consumers the option to purchase one or more goods or services at a discount (discount features) should be subject to the BCL. The district court rejected this argument in regard to Vertrue's financial and privacy programs, reasoning that such an interpretation would reach too broadly encompassing entities that "cannot reasonably be considered buying clubs." While most of Vertrue's financial and privacy programs offered discounts, the court considered these to be ancillary benefits and concluded the BCL applies only to membership programs in which the primary benefit is the option to purchase discounted goods or services.[5]

---

[5]This case concerns the entitlement to purchase goods or services at a discount. However, we acknowledge section 552A.1 applies not only to purchases at a discount,

The district court also concluded the BCL did not apply to Vertrue's health programs, reasoning they are similar to Health Management Organizations (HMO) or Preferred-Provider Organizations (PPO), which the legislature likely did not seek to regulate in enacting the BCL.

Section 552A.1 of the BCL provides the following definitions:

> As used in this chapter, unless the context otherwise requires:
>
> 1. "*Buying club*" means a corporation, partnership, unincorporated association, or other business enterprise which sells or offers for sale to the public generally memberships or certificates of membership.
>
> 2. "*Contract*" means the agreement by which a person acquires a membership in a buying club.
>
> 3. "*Membership*" means certificates, memberships, shares, bonds, contracts, stocks, or agreements of any kind or character issued upon any plan offered generally to the public entitling the holder to purchase merchandise, materials, equipment, or service, either from the issuer or another person designated by the issuer, either under a franchise or otherwise, whether it be at a discount, at cost plus a percentage, at cost plus a fixed amount, at a fixed price, or on any other similar basis.

Iowa Code § 552A.1. Section 552A.2 contains a list of exemptions excluding certain types of businesses and organizations from the coverage of the BCL. The parties agree that none of the exemptions apply to any of Vertrue's financial, privacy, or health programs.

The legislature has provided no further guidance for determining whether the definition of buying club membership excludes plans that offer an entitlement to purchase discounted goods and services when the membership plan also, or perhaps primarily, offers consumers other distinct benefits. In interpreting section 552A.1, we apply well-settled principles of statutory construction in order "to give effect to the

---

but also to purchases "at cost plus a percentage, at cost plus a fixed amount, at a fixed price, or on any other similar basis." *See* Iowa Code § 552A.1(3).

legislative intent of [the] statute." *Watson v. Iowa Dep't of Transp. Motor Vehicle Div.*, 829 N.W.2d 566, 569 (Iowa 2013) (citation and internal quotation marks omitted). The BCL is a remedial statute; accordingly, we construe it liberally to effectuate its purposes. *State ex rel. Miller v. Cutty's Des Moines Camping Club, Inc.*, 694 N.W.2d 518, 528 (Iowa 2005).

A straightforward reading of section 552A.1 would make the BCL applicable to "any plan offered generally to the public entitling the holder to purchase merchandise, materials, equipment, or service . . . at a discount," notwithstanding the other consumer benefits the district court concluded were the "primary purpose" of those membership plans.[6] Iowa Code § 552A.1(3). We acknowledge that this interpretation could, in theory, encompass membership plans the legislature may not have intended to regulate. However, adoption of a "primary purpose" limitation would undoubtedly encumber the BCL and leave it vulnerable to circumvention by clever fraudsters. *Dier v. Peters*, 815 N.W.2d 1, 11 (Iowa 2012) ("[T]ribunals [should have] the liberty to deal with [fraud] in whatever form it may present itself." (Citation and internal quotation marks omitted.)); *cf. State ex rel. Miller v. Hydro Mag, Ltd.*, 436 N.W.2d 617, 621 (Iowa 1989) (noting that consumer fraud protections are undermined by reading unlisted elements into a CFA analysis). If we were to imply such a limitation into section 552A.1, future sellers would be afforded an opportunity to evade BCL enforcement by meticulously balancing discount and nondiscount features and otherwise obscuring the primary purpose of a program that is, in essence, a buying club

---

[6]We find error in the district court's ruling in several respects. Many of the programs excluded by the district court, some of which offer a far greater number of discount features than any other purported benefits, would clearly fit within the "primary purpose" definition it adopted.

membership. The district court's reliance on the fact "the programs [we]re not marketed as discount programs" renders the BCL open to this sort of perversion. Moreover, as the primary benefit of any given membership can vary significantly from consumer to consumer, the inherent vagueness in the primary purpose rationale increases the likelihood BCL enforcement will be rendered illusory as courts struggle to determine whether a program's discount features predominate over the nondiscount features. In addition, implying a primary purpose limitation into the BCL would require us to invent satisfactory principles and standards for guiding a treacherous inquiry with no legislative guidance.

It is also noteworthy that none of Vertrue's programs provide any independent services to consumers. The programs at issue, without exception, involve the bundling of numerous goods and services from various merchants. Upon bundling the goods and services into one membership, Vertrue offers consumers the membership at a monthly rate. We recognize that this practice does not fit within the literal definition of a buying club membership under section 552A.1 because it does not "entitl[e] the holder to purchase" goods and services at a discount. However, this practice is strikingly similar to the administration of the classic buying club membership established in section 552A.1. Both practices offer the consumer the ability to receive various goods and services at a predetermined rate.

As noted above, the purpose of the BCL is to protect consumers from overreaching merchants of buying club memberships. Many of Vertrue's financial, privacy, and health programs contain manifold discount features that unquestionably predominate over any other purported benefits. Additionally, the record is replete with examples of consumers who were unwittingly enrolled in Vertrue's financial, privacy,

and health programs through the use of misleading solicitations and overreaching marketing tactics. While a case may come along in which a literal application of section 552A.1 would lead to results so absurd that a limitation must be implied into its interpretation, this is not that case. The BCL contains exemptions, but it does not exempt memberships that offer financial, privacy, or health-related discounts or programs that contain only one discount feature. *See* Iowa Code § 552A.2(3). Thus, the plain language of the statute dictates all of Vertrue's financial, privacy, and health memberships that offer one or more discount features are subject to the terms of the BCL. Accordingly, we reverse the district court's ruling to the extent it excluded these programs. Our resulting modification of the district court's BCL reimbursement award is discussed below.

**III. Reimbursement Under the BCL and CFA.**

**A. Scope of Review.** Our review of this equity ruling is de novo; however, we review the district court's interpretation of sections 552A.5 and 714.16(7) for correction of errors at law. *See Iowa Film,* 818 N.W.2d at 217.

**B. Analysis.** The parties dispute the requisite elements of proof required to obtain a reimbursement award under the BCL as well as under the CFA. The CFA sets forth the remedies available upon proof of an unlawful practice. Iowa Code § 714.16(7). It states, in relevant part, as follows:

> Except in an action for the concealment, suppression, or omission of a material fact with intent that others rely upon it, it is not necessary in an action for reimbursement or an injunction, to allege or to prove reliance, damages, intent to deceive, or that the person who engaged in an unlawful act had knowledge of the falsity of the claim or ignorance of the truth.

*Id.* Any violation of the BCL also violates section 714.16(2)(*a*) of the CFA. *Id.* § 552A.5(1). Accordingly, any violation of the BCL triggers remedies under section 714.16(7) of the CFA. The CFA states, in part:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

*Id.* § 714.16(2)(*a*).

In its liability ruling, the district court concluded Vertrue's marketing practices independently violated the BCL and CFA. In the CFA portion of its analysis, the court concluded Vertrue's direct mail, telephone, and Internet solicitation practices amounted to unfair practices. Additionally, the district court concluded Vertrue's direct mail solicitations were deceptive.

Furthermore, the district court concluded Vertrue's breakage practices violated the CFA. Breakage refers to the practice by which "free premiums (*e.g.*, $25 Wal-Mart gift card) that are used to lure consumers into trial memberships are never actually provided to the consumers." The court referred to Vertrue's practice as a "double breakage model" because it required "consumers to jump two sets of unnecessary hurdles . . . for the sole purpose of making it difficult for consumers to redeem the promised premium." The district court held this practice was deceptive, unfair, and an omission of a material fact under the CFA. *See id.*

In the remedies trial, the State argued that proof of reliance, damages, intent to deceive, and knowledge of falsity are never required to

obtain reimbursement under the CFA, even in a claim alleging "concealment, suppression, or omission of a material fact." *See id.* § 714.16(7). Alternatively, the State argued that all of the remedies contained in section 714.16(7) are available for any violation of the BCL without proof of additional elements. The district court rejected both arguments, reasoning a BCL violation "is by definition a concealment or omission."

Consequently, the district court proceeded to evaluate the State's evidence of reliance. The court relied primarily on the testimony of Vertrue's expert, Thomas Maronick, who testified at trial that ninety percent to ninety-five percent of Vertrue's Internet customers would not have signed up for a membership if Vertrue were required to conduct in-person disclosures. Based predominantly on Maronick's testimony, the court concluded ninety percent of consumers who purchased Vertrue's membership programs would have canceled within the three-day period had Vertrue complied with the BCL. Accordingly, the district court ordered a reimbursement award of ninety percent of the net membership fees Vertrue acquired by means of non-BCL-compliant solicitations. This figure came to $22,715,073.65. However, the court denied CFA reimbursement for Vertrue's breakage practice upon concluding there was "no evidence in the record upon which to make a finding of reliance."

On appeal, Vertrue disputes the reliance aspect of the district court's reimbursement award, arguing there is no logical connection between Maronick's testimony and the district court's conclusion that ninety percent of Iowa consumers would have canceled had they received BCL-compliant disclosures.[7] The State counters that the district court's

---

[7]Maronick's testimony was presented by Vertrue for the purpose of establishing that compliance with section 552A.3 of the BCL would cripple Vertrue's ability to conduct its business. This argument was also based on Vertrue's faulty premise under

ruling was adequately supported by record evidence and Maronick's testimony constituted a principled basis for evaluating reliance. Additionally, the State cross-appealed the district court's rulings regarding the applicability of section 714.16(7)'s additional proof elements to a remedial determination for both BCL and CFA violations.

We find it unnecessary to address Vertrue's arguments regarding the sufficiency of the evidence to support the district court's findings on reliance. Additionally, because we conclude that the State was entitled to full BCL reimbursement without a reliance-based reduction for Vertrue's mail, telephone, and Internet solicitations, we do not reach the State's argument that it was not required to prove section 714.16(7)'s additional elements in order to obtain reimbursement for the same programs under the CFA.

1. *Reimbursement under the BCL.* First, we consider what proof must be shown to obtain a reimbursement award for a violation of the BCL. In order to obtain reimbursement in cases alleging "concealment, suppression, or omission of a material fact," the State must prove "reliance, damages, intent to deceive, [and] . . . knowledge of the falsity of the claim or ignorance of the truth." *Id.* These requirements are recognizable as elements in a claim for common law fraud. *See Dier*, 815 N.W.2d at 7 (setting forth the traditional elements of a common law fraud claim).

Section 714.16(2)(*a*) establishes various unlawful practices under the CFA, one of which is "the concealment, suppression, or omission of a material fact with intent that others rely upon [it] . . . in connection with the . . . sale . . . of any merchandise." Our reading of section 714.16, as

_____

which compliance with section 552A.3 requires in-person interaction at the time of the transaction.

well as our precedent, leads to the inexorable conclusion that each of these unlawful practices is a distinct line of inquiry under the CFA. *See Cutty's*, 694 N.W.2d at 527 ("[D]eceptive and unfair practices are distinct lines of inquiry . . . . [W]hile a practice may be both deceptive and unfair, it may be unfair without being deceptive." (Citation and internal quotations marks omitted.)). Similarly, we read section 552A.5 of the BCL as effectively making violations of the BCL an additional distinct unlawful practice under section 714.16(2)(*a*).

The legislature specifically required proof of the additional common law fraud elements in order to obtain reimbursement for only one distinct unlawful practice—"concealment, suppression, or omission of a material fact." *See* Iowa Code § 714.16(7). The legislature demonstrated its intent to single out this particular unlawful practice by using the exact same language that appears in section 714.16(2)(*a*). *Compare id.* § 714.16(7), *with id.* § 714.16(2)(*a*). BCL violations are not listed as one of the unlawful practices for which the State must prove the additional common law fraud elements in order to obtain injunctive relief or a reimbursement award. *See id.* § 714.16(7). We have consistently "observed that legislative intent is expressed by omission as well as by inclusion." *Watson*, 829 N.W.2d at 570. By only listing "concealment, suppression, or omission of a material fact" in section 714.16(7) and excluding the other types of unlawful practices established by section 714.16(2)(*a*), we think it clear the legislature intended the additional proof elements to apply only to the listed unlawful practice. As we said in *State ex rel. Miller v. Pace*, the CFA "is not a codification of common law fraud principles" and, accordingly, absent explicit direction from the legislature, we decline to impose upon the State the burden of proving common law fraud elements in order to obtain reimbursement for

unlawful practices not specifically listed as requiring additional proof under section 714.16(7). 677 N.W.2d 761, 770 (Iowa 2004).

Moreover, there is nothing in the legislative scheme suggesting the legislature intended that a remedy be crafted by determining what kind of CFA cause of action an alleged BCL violation most resembles. No statutory guidance has been set forth for this determination. Thus, in assessing what remedies are available for a BCL violation under section 714.16(7), the district court was not authorized to engage in an analysis to determine which CFA cause of action the BCL violation generally supports.

A contrary conclusion may suggest the State is required to prove a violation also amounted to a "concealment, suppression, or omission of a material fact" in order to be entitled to recovery for any BCL violation. However, the BCL, as well as a number of other consumer protection statutes that incorporate the remedies provisions of the CFA,[8] prohibits acts section 714.16(2)(*a*) was not designed to prevent. *See State ex rel.*

---

[8]Numerous consumer protection statutes incorporate the remedies provision of the CFA by referencing section 714.16 in an identical or similar fashion to section 552A.3. *See, e.g.*, Iowa Code § 9D.4(3) (2013) (Travel Agencies and Agents); *id.* § 13C.8 (Organizations Soliciting Public Donations); *id.* § 126.5(5) (Drugs, Devices, and Cosmetics); *id.* § 261B.12(3) (Registration of Postsecondary Schools); *id.* § 321.69(11) (damage disclosure statement); *id.* § 321.69A(4) (Disclosure of repairs to new vehicles); *id.* § 322G.10 (Defective Motor Vehicles (Lemon Law)); *id.* § 516D.9 (Rental of Motor Vehicles); *id.* § 516E.15(l)(*a*)(l) (Motor Vehicle Service Contracts); *id.* § 523A.807(1) (Cemetery and Funeral Merchandise and Funeral Services); *id.* § 523G.9(7) (Invention Development Services); *id.* § 523I.205(1) (Iowa Cemetery Act); *id.* § 535C.10(2) (Loan Brokers); *id.* § 537B.6 (Motor Vehicle Service Trade Practices Act); *id.* § 543D.18A(2) (Penalties for improper influence of an appraisal assignment); *id.* § 552.13(2) (Physical Exercise Clubs); *id.* § 554.3513(6) (Civil remedy for dishonor of a check, draft, or order); *id.* § 555A.6(2) (Door-to-Door Sales Act); *id.* § 557B.14(1) (Membership Campgrounds); *id.* § 714.21A (Civil enforcement for specified sections of chapter 714 (Theft, Fraud, and Related Offenses)); *id.* § 714A.5 (Pay-Per-Call Service); *id.* § 714B.7 (Prize Promotions); *id.* § 714D.7(1) (Telecommunications Service Provider Fraud); *id.* § 714E.6(1) (Foreclosure Consultants); *id.* § 714F.9(1) (Foreclosure Reconveyances); *id.* § 714G.11 (Consumer Credit Security); *id.* § 715A.8(4) (Identity theft); *id.* § 715C.2(8)(*a*) (Personal Information Security Breach Protection); *id.* § 716A.6(3)(*a*) (Electronic Mail).

*Miller v. Santa Rosa Sales & Mktg., Inc.*, 475 N.W.2d 210, 218 (Iowa 1991) (noting the DDSA and the statute governing lotteries prohibit acts section 714.16(2)(*a*) was not designed to prevent). Furthermore, requiring this additional showing would render these consumer protection statutes, including the BCL, either ineffective or redundant in direct contravention of clear legislative intent.

We acknowledge that the legislative language applies the additional proof requirements to "*action*[s] for the concealment, suppression, or omission of a material fact." Iowa Code § 714.16(7) (2005) (emphasis added). However, we think "action" contemplates a "cause of action." Therefore, the additional common law fraud elements must be proven for causes of action alleging "concealment, suppression, or omission of a material fact." In turn, the State is not required to prove the additional elements for every violation of section 714.16(2)(*a*) in any lawsuit that alleges concealment, suppression, or omission of a material fact in addition to other unlawful practices.[9] Thus, the most rational, straightforward application of section 714.16(7) only requires the State to prove the additional common law fraud elements in order to obtain reimbursement or injunctive relief on a claim of "concealment, suppression, or omission of a material fact" under section 714.16(2)(*a*).

---

[9]It goes without saying that an act may amount to a concealment, suppression, or omission of a material fact, as well as one of the other unlawful acts contained in section 714.16(2)(*a*). *See Cutty's,* 694 N.W.2d at 527 ("[W]hile a practice may be both deceptive and unfair, it may be unfair without being deceptive. The disjunctive language of the Iowa Act clearly requires proof of only one, not both, sorts of conduct." (Citation and internal quotation marks omitted.)); *Pace,* 677 N.W.2d at 766 (affirming district court ruling that defendant's "conduct constituted an 'unfair practice' and 'deception' under the consumer fraud provision of chapter 714"). It would not make sense to require proof of the additional common law fraud elements when the State proves an unlawful act, such as deception, simply because the underlying conduct also amounted to a concealment, suppression, or omission of a material fact. The same applies for a BCL violation.

2. *Equitability of the BCL reimbursement award.* Vertrue next contends the reimbursement award for its BCL violations contravenes principles of equity. Vertrue first asserts the voluntary payment doctrine precludes any award of reimbursement. The Seventh Circuit has explained the doctrine as a common law principle according to which " 'a plaintiff who voluntarily pays money in reply to an incorrect or illegal claim of right cannot recover that payment unless he can show fraud, coercion, or mistake of fact.' " *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (quoting *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 666 (7th Cir. 2001)). In support of this argument, Vertrue cites *Spivey* in which the Seventh Circuit, relying on the voluntary payment doctrine, affirmed the district court's grant of summary judgment to a defendant telemarketing company in a consumer class action alleging breach of contract and unjust enrichment. *Id.* at 817, 824.

We have never recognized the voluntary payment doctrine and decline to do so now. Even if we did recognize the doctrine, it would not apply here because, unlike the plaintiffs in *Spivey*, the State has proven consumer fraud. *See id.* at 822 (noting the voluntary payment doctrine is inapplicable in cases in which fraud is shown). Moreover, application of the doctrine in consumer protection actions would have the effect of judicially vitiating consumer protection legislation. The CFA is a remedial statute, and accordingly, we are bound to give it a liberal interpretation, not an illusory one. *See Cutty's*, 694 N.W.2d at 527–28. Numerous courts have declined to apply the voluntary-payment doctrine in actions alleging violations of consumer protection statutes, concluding such an application would subvert the underlying purpose of these statutes. *See, e.g., Southstar Energy Servs., LLC v. Ellison*, 691 S.E.2d

203, 206 (Ga. 2010) ("Judicially imposing [Georgia's legislatively enacted voluntary payment doctrine] on consumers' statutory right to bring an action contravenes the clear legislative intent that the protection of consumers is the most important factor for any decision made under the Natural Gas Act."); *Ramirez v. Smart Corp.*, 863 N.E.2d 800, 810 (Ill. App. Ct. 2007) ("The effect of such transgressive acts [that violate statutorily-defined public policy], generally speaking, is that the voluntary payment rule will not be applicable."); *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 727 (Mo. 2009) ("To allow [the defendant] to avoid liability for this unfair practice through the voluntary payment doctrine would nullify the protections of the [Missouri Merchandising Practices Act] and be contrary to the intent of the legislature."); *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 24 (Wash. 2007) ("[T]he voluntary payment doctrine is inappropriate as an affirmative defense in the . . . context [of Washington's Consumer Protection Act], as a matter of law, because we construe the CPA liberally in favor of plaintiffs."). We agree.

Vertrue also argues the State's delay in enforcing section 552A.3 renders a reimbursement award inequitable. According to Vertrue, the thirteen years between the enactment of the BCL in 1993 and the State's initiation of this action in 2006 allowed Vertrue's understanding of Iowa law to crystallize and resulted in an unduly large and burdensome award. Vertrue further argues the State can uphold the public interest through the use of civil penalties and future enforcement without pursuing reimbursement claims, many of which would be time-barred if brought by individual consumers. Vertrue has not cited any cases or known legal principles that appear to support these arguments. However, in our view, these arguments can essentially be characterized as claims of laches and equitable estoppel.

Laches, however, does not apply against the government. *See State ex rel. Weede v. Iowa S. Utils. Co. of Del.*, 231 Iowa 784, 838, 2 N.W.2d 372, 400 (1942). Similarly, estoppel by acquiescence only applies against the government in the most exceptional cases. *Bailiff v. Adams Cnty. Conference Bd.*, 650 N.W.2d 621, 627 (Iowa 2002). No exceptional circumstances justify the doctrine's application here. *See id.*

Accordingly, we reverse the district court's ruling to the extent it required proof of reliance, damages, intent to deceive, and knowledge of falsity in order to obtain a BCL reimbursement award. In light of this holding and our previous holding that Vertrue's financial, privacy, and health program are covered by the BCL, we modify the district court's BCL reimbursement award to $36,308,187.58—the figure reflected in the record for net payments received for non-BCL-compliant membership programs.

## IV. Evidentiary Support for CFA Violations Based on Vertrue's Telemarketing and Internet Practices.

**A. Scope of Review.** Our review of this equity action is de novo. *See* Iowa Code §§ 552A.5, 714.16(7); *see also* Iowa R. App. P. 6.907. Accordingly, "[w]e give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013); *accord* Iowa R. App. P. 6.904(3)(*g*). "Nonetheless, the appellant is not entitled 'to a trial de novo, only review of identified error de novo.' Consequently, 'our review is confined to those propositions relied upon by the appellant for reversal on appeal.' " *Pace*, 677 N.W.2d at 767 (quoting *Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) (emphasis omitted)).

**B. Analysis.** Vertrue contends the record does not support the district court's finding of CFA violations based on its telemarketing solicitations. Specifically, Vertrue argues the district court erred in concluding a telemarketing script for its Home Works Plus program and a recorded telemarketing exchange contained deceptive and unfair features. Additionally, Vertrue challenges the reliability of exhibit 620, a spreadsheet listing ninety-one different Vertrue telemarketing scripts, which the State introduced during the remedies phase of the trial. Vertrue also assigns error to the district court's finding that Vertrue's practice of requiring separate cancellation phone calls in situations in which more than one membership was purchased in a single Internet transaction (bundled Internet memberships) to be unfair and deceptive.[10]

We examine Vertrue's solicitations and business practices to determine whether they involve unfair or deceptive features in violation of the CFA. " '[D]eceptive and unfair practices are distinct lines of inquiry. . . . [W]hile a practice may be both deceptive and unfair, it may be unfair without being deceptive.' " *Cutty's*, 694 N.W.2d at 527 (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1367 (11th Cir. 1988)). We have said that " '[d]eception occurs primarily (though not exclusively) at the formation stage of a contract. Conversely, unfairness occurs primarily (though not exclusively) with respect to the substance or performance of a contract.' " *Id.* (quoting Michael M. Greenfield,

---

[10]Alternatively, Vertrue argues that the district court erred in ordering CFA reimbursement for all net revenues received from both of the bundled Internet membership programs instead of limiting reimbursement to the "add-on" fees incurred in the second program after the first one was canceled. Because we concluded the State was entitled to reimbursement under the BCL for these programs, we find it unnecessary to reach any questions regarding reimbursement for CFA violations. Accordingly, we address Vertrue's arguments regarding CFA violations solely for the purpose of determining whether the record supports the district court's order of civil penalties in relation to Vertrue's conduct.

*Consumer Law: A Guide for Those Who Represent Sellers, Lenders, and Consumers* § 4.1, at 161 (1995)).

The CFA defines deception as "an act or practice which has the tendency or capacity to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714.16(1)(*f*). To ascertain whether a practice is likely to mislead in the consumer protection context, courts typically evaluate the overall or "net impression" created by the representation. *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006); *see also FTC v. USA Fin., LLC*, 415 F. App'x 970, 973 (11th Cir. 2011) ("The overall impression created by the calls was that consumers were receiving a card that could be used to make purchases anywhere."); *Beneficial Corp. v. FTC*, 542 F.2d 611, 616 (3d Cir. 1976) ("[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context."); *Murray Space Shoe Corp. v. FTC*, 304 F.2d 270, 272 (2d Cir. 1962) ("In deciding whether petitioner's advertising was false and misleading we are not to look to technical interpretation of each phrase, but must look to the overall impression these circulars are likely to make on the buying public. And statements susceptible of both a misleading and a truthful interpretation will be construed against the advertiser." (Citations omitted.)). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *Cyberspace.Com*, 453 F.3d at 1200. "A misleading impression created by a solicitation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" *Id.* at 1201 (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)).

Section 714.16(1)(*n*) defines unfair practice as "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." We have recognized that many courts consider an unfair practice to be "nothing more than conduct 'a court of equity would consider unfair.'" *Cutty's*, 694 N.W.2d at 525 (quoting *S. Atl. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 535 (4th Cir. 2002) (emphasis omitted)). Accordingly, "statutes that prohibit 'unfair practices' are designed to infuse flexible equitable principles into consumer protection law so that it may respond to the myriad of unscrupulous business practices modern consumers face." *Id.*

1. *The Home Works Plus script.* The district court found numerous deceptive and unfair features in the following script used for inbound telemarketing[11] solicitations of Vertrue's Home Works Plus program:

> "To thank you, we're sending you a voucher for a free $25 gift card to The Home Depot with a risk-free 30-day trial membership in Home Works Plus. Offered by Major Savings, this service offers you hundreds of dollars in savings at stores like The Home Depot, Kmart, Circuit City, Linens and Things, Macy's and more of your favorite stores through their gift card program. You can also save up to 40% on name brand furniture, appliances, electronics and more through the Home Works Plus discount shopping service. Now if you want to cancel, just call the toll free number in your welcome package in the first 30 days and you won't be charged. And with your OK today, if you decide not to cancel, after the 30 day trial the service is automatically extended to a full year for just $139.95, charged as Home Works Plus to the credit card you provided today and the free $25 gift card to The Home Depot is yours to claim just for trying the program, OK?"

---

[11]Inbound telemarketing generally occurs when a consumer initiates a call to purchase a product or service from an unrelated business having a partnership arrangement with Vertrue. For example, a consumer may call to place a catalog order. At the conclusion of the call, the partner either personally solicits the consumer or transfers the consumer to one of Vertrue's sales representatives for the purpose of trying to "upsell" (*e.g.,* offer) the consumer a trial membership.

Vertrue's telemarketers also requested consent a second time, in the following terms:

> Great. Your welcome packet will arrive within two weeks, but you can access your benefits within the next 3 business days or cancel anytime by calling 1-800-XXX-XXXX. Now, Mr./Mrs. (last name), to confirm your (product name) order I'll need to verify the last four digits of your credit card. What are the last four digits of the credit card you're using today?

We conclude the script is misleading. Opening with an ostensible "thank you" does not promptly disclose the purpose of the interaction, but rather fosters the misleading impression that the new interaction is somehow related to the initial transaction. *See FTC v. Publishers Bus. Servs., Inc.*, 821 F. Supp. 2d 1205, 1224 (D. Nev. 2010) (concluding defendant's call script was deceptive because it did not promptly disclose the purpose of the call, but rather purported to offer a "small surprise"). This serves to exploit consumers by creating the impression that the business they had just knowingly patronized was offering a $25 gift card to encourage future patronage. *Cf. Floersheim v. FTC*, 411 F.2d 874, 876 (9th Cir. 1969) (finding debt-collecting forms from private collections company deceptive partly because they "create[d] the impression that they c[a]me from the government or some other official source").

Vertrue was not offering to send the consumer a $25 gift card as a "thank you" because, at that point, the consumer had not done anything to receive the gratification of Vertrue. As the record demonstrates, the actual purpose of the $25 gift card was to lure unwitting consumers into enrolling in membership programs. Furthermore, the $25 gift card was not a gift, but rather was a term of the offer surreptitiously made by Vertrue. Therefore, the manner in which the script opened dialogue with the potential consumer was likely to be misleading. In order to avoid

violating the prohibitions of section 714.16(2)(*a*) against deceptive acts, at the very least, a telemarketer should disclose rather than obscure the purpose of the interaction at its outset. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005) (finding telemarketing script to be misleading in violation of the Federal Trade Commission Act and the Telemarketing Sales Rule when the opening lines refer to the consumer's "recent application for 'a credit card' " thereby obscuring the nature of the offer and misleading consumers into believing the call constituted an offer for a credit card).

The script effectively conveyed the impression the consumer was not forming a binding agreement, but rather was merely acquiescing to a "risk free" gift from the caller. *See Publishers Bus. Servs.*, 821 F. Supp. 2d at 1224 (holding call script was deceptive in part because it claimed "there is no catch involved"). Vertrue asserts the transaction was risk free because a consumer could avoid financial obligation by canceling within the thirty-day trial period. According to Vertrue, "the script stated, in easily understandable fashion, all of the program's material terms" and "had consumers paid attention, they did or would have understood." This argument is based on the flawed presumption that consumers, in fact, understood the true purpose of the interaction. *See id.* at 1225 (rejecting argument that consumers acted unreasonably by agreeing to terms in telemarketing pitch without listening carefully because the evidence demonstrated that the consumers were "[un]aware they [we]re agreeing to terms to which they w[ould] later be held"). However, the telemarketer's sales pitch, which briskly transitioned from a deceptive "thank you," to the hastily recited terms, and then to an abrupt "OK?" did not reveal to consumers that they were being confronted with a purchase decision. Nor is it likely that an ordinary

consumer would understand they were agreeing to enroll in a membership program with attendant financial obligations by approving the mailing of a gift card.

Furthermore, the CPD survey of Vertrue members suggested that sixty-seven percent of respondents were unaware of their memberships and/or did not believe they had authorized Vertrue to charge their credit cards. Data collected from Vertrue's own internal marketing studies demonstrates that 84.6% of members never used their memberships. The fact that the vast majority of Vertrue's members never benefited at all from their memberships is persuasive evidence that Vertrue's telemarketing solicitations misled a substantial number of consumers as to the material facts underlying the transactions. *Cf. FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("Given the voluminous evidence showing that very few people made money using the Stefanchik Program as promised in the advertising materials and telemarketing pitches . . . we conclude . . . the marketing material made misrepresentations in a manner likely to mislead reasonable consumers."). The statistical data presented by the State is consistent with the trial testimony of numerous consumers stating they were misled by telemarketing pitches containing features identical to those contained in the Home Works Plus script. Complaints to the CPD and Better Business Bureau (BBB) were also consistent with the State's contention that multitudes of consumers unknowingly enrolled in one of Vertrue's memberships as a result of similar telemarketing solicitations. A sample of BBB complaints from Vertrue's members was analyzed by the State, and the data suggested that about seventy-five percent involved consumers complaining about "unauthorized charges." Clearly, evidence that consumers were in fact misled is relevant to determining whether a solicitation had a tendency to

mislead. *See State ex rel. Miller v. Nat'l Dietary Research, Inc.*, 454 N.W.2d 820, 825 (Iowa 1990). The record demonstrates Vertrue had knowledge of the nature and number of BBB complaints and continued these practices nonetheless.

The district court correctly rejected Vertrue's request to focus on the second request for consent and properly considered the net impression created by the solicitation. *Cf. FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1274 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013) (holding disclaimer in retainer agreements was received "far too late" to cure the misleading net impression created by deceptive telemarketing sales script). The presence of a disclosure or request for consent does not alone cure a misleading solicitation if the net impression remains deceptive because material elements of the transaction remain obscured. *Cf. Cyberspace.Com*, 453 F.3d at 1200–01 (holding misleading solicitation for Internet service was deceptive notwithstanding disclosure in fine print); *In re Raymond Lee Org., Inc.*, Docket No. 9045, 1978 WL 206103, at *100 (F.T.C. Nov. 1, 1978) ("[T]he contract disclaimers relied upon by respondents are insuffic[ient] to counter the overall impression fostered by RLO's written and oral representations."), *aff'd sub nom Lee v. FTC*, 679 F.2d 905 (D.C. Cir. 1980). Here, the second request for consent did not alleviate the misleading net impression because it did not repeat the terms of the membership. Rather, it reinforced the false impression the consumer was receiving a complimentary gift from the initial business by asking only for *confirmation* of the last four digits of the credit card the consumer used in the unrelated purchase.

Of course, the underlying performance terms of the membership offer were material as they presumably constituted the most important

factor affecting consumers' decisions to enter into a long-term obligation to pay Vertrue monthly premiums. *See Cyberspace.Com*, 453 F.3d at 1201; *see also Publishers Bus. Servs.*, 821 F. Supp. 2d at 1225 ("[Telemarketers'] representations are material because the net impression has a tendency to mislead the consumer into agreeing to a long-term obligation to pay [defendant] hundreds of dollars."). Accordingly, misleading consumers about such terms constitutes a deceptive act.

Vertrue's focus on the testimony of four members who made use of their memberships was unconvincing in the face of the evidence as a whole. *See FTC v. Tashman*, 318 F.3d 1273, 1278 (11th Cir. 2003) (holding the district court erred in focusing "on a few satisfied customers" when overwhelming evidence demonstrated misleading representations). The weight of the evidence reveals the majority of Vertrue's members never used Vertrue's services, and a surprising number did not even know they were members. In sum, the record contains extensive evidence that the Home Works Plus telemarketing script had the tendency to mislead a substantial number of consumers as to the material terms of the transaction, and the use of it was therefore a deceptive act under section 714.16(2)(*a*).

For many of the same reasons, we conclude the use of the script also constituted an unfair practice. A course of conduct contrary to what an ordinary consumer would anticipate contributes to a finding of an unfair practice. *See Cutty's*, 694 N.W.2d at 530 (considering conduct that an ordinary consumer would not anticipate as a factor contributing to unavoidable injury). By creating the misleading impression that the consumer was still dealing with the original business with which they had just made an unrelated purchase, the script created a situation

unanticipated by consumers. There was a substantial likelihood this concealment would result in unavoidable injury to consumers who were unaware they were agreeing to join a membership program at a monthly premium. *See id.* (noting that ambiguous documents designed to lure "unwitting consumers into ownership" could result in unavoidable consumer injury). In light of record evidence demonstrating that 84.6% of Vertrue's members never used their memberships, we cannot conclude the script resulted in any prevailing consumer or competitive benefits. Accordingly, we also affirm the district court's ruling that the use of the script constituted an unfair practice under section 714.16(2)(*a*).

2. *The recorded telephone exchange.* Vertrue also claims the district court erred by concluding that a recording of an outbound telemarketing solicitation demonstrated an unfair and deceptive act in violation of the CFA. Vertrue's outbound telemarketing solicitations were generally administered by third-party vendors hired to call consumers and market Vertrue's programs. In the recording, a telemarketer solicits seventy-six-year-old Patricia Ackelson to purchase a program called "Simple Escapes." Ackelson testified at the liability trial that the interaction arose from an unexpected call she received from a telemarketer.

Vertrue's recording of part of the exchange was introduced into evidence. Ackleson was informed she would receive a thirty-day trial for a one-dollar fee, and she could cancel the membership by calling an 800 number. As above, the caller then requested a simple cumulative assent to the terms without determining whether Ackelson understood them. After Ackelson responded, "alright," the caller gave her some additional information about using the program and then, bizarrely, sought a second confirmation of assent by asking Ackelson for her city of birth.

Vertrue contends that Ackelson's testimony demonstrates that she understood the "general nature" of the transaction, she was interested in the program, and she understood the trial period. Therefore, according to Vertrue she cannot be found to have been deceived or subjected to an unfair practice. At the trial, Ackelson was hearing the tape-recorded exchange for at least the fourth time. Yet, immediately afterwards she was unable to indicate numerous essential aspects of the exchange including the name of the membership program in which she was enrolling, why she was being charged one dollar, whether there was a gift card involved, or why she had been asked for her city of birth. She described the telemarketer's presentation as "really, really fast." Even though she believed that she had canceled the membership within the thirty-day membership period she remained enrolled in the program for twelve months at a monthly fee of $14.95. She only received a refund for one of these monthly payments, and she never received a gift card. She never used the membership, and when she realized she was being charged for it, she called the Attorney General's Office.

A review of the recorded exchange illustrates the manner in which Vertrue's telemarketing solicitations were incontestably deceptive and unfair in practice. As the district court noted, the "telemarketer had a heavy accent, and spoke at a very fast pace, rendering much of the pitch unintelligible." Our review demonstrates that critical portions of the exchange cannot be understood without carefully scrutinizing the recording. It would have been unreasonable for the telemarketer to presume that Ackelson would have had an opportunity to record the telephone number provided for cancellation. In addition, it would have been unreasonable for the telemarketer to presume Ackelson had acquired a basic understanding of the essential terms of membership

enrollment. Yet, the telemarketer made no attempt to verify that Ackelson had actually understood and assented to those terms. Rather, the telemarketer relied on a general indication of assent to proceed and then requested Ackelson's city of birth as a means of verifying her assent to the enrollment terms. This delusive manner of requesting assent further created the misleading impression that the consumer was merely verifying personal information for the purpose of receiving a benefit from a familiar business as a result of a recent transaction.

This unintelligible telemarketing pitch that proceeded at a lightning pace was likely to mislead consumers as to the material terms of the transaction. *See FTC v. Kuykendall*, 371 F.3d 745, 757–58 (10th Cir. 2004) (finding a violation of the Telemarketing Sales Rule sufficient to support violation of injunction entered in previous FTC enforcement action when, *inter alia*, telemarketers used "rapid fire and confusing language" in a magazine subscription sales pitch); *Publishers Bus. Servs.*, 821 F. Supp. 2d at 1225 (finding telemarketing pitch to be misleading when, *inter alia*, the telemarketer spoke so rapidly that consumers were confused as to the terms of the offer). Similarly, the misleading nature of the telemarketing pitch is likely to have resulted in substantial, unavoidable injury by causing Ackelson to pay twelve monthly premiums without fully understanding the fact she had enrolled or the terms of the program. Vertrue has not identified any cognizable competitive or consumer benefits attendant to the telephone solicitation of Ackelson.

Vertrue argues that "the recording does not constitute a full and fair representation of the exchange" because Vertrue does not record entire telemarketing calls, but only the portions in which the consumers confirm acceptance. However, Vertrue presented nothing more than an assertion that in the opening of the call the telemarketer adequately

explained the program to Ackelson. This assertion is unsupported in a record otherwise replete with evidence Vertrue consistently utilized telemarketing scripts with misleading features. *See Publishers Bus. Servs.*, 821 F. Supp. 2d at 1225–26 (noting record evidence demonstrated that corporation's telemarketers selectively disclose material terms, "speak quickly," and "evade consumer questions" and rejecting corporation's "bare assertions" to the contrary). Accordingly, we affirm the district court's ruling that the telemarketing exchange with Ackelson was deceptive and constituted an unfair act under section 714.16(2)(*a*).

3. *Reliability of exhibit 620.* The State introduced a spreadsheet indicating ninety-one of Vertrue's telemarketing scripts contained purportedly unfair or deceptive features. In the spreadsheet, the State indicated whether each script contained any of five allegedly deceptive or unfair characteristics. Vertrue argues exhibit 620 was not a reliable basis for the district court to conclude the ninety-one scripts at issue contained CFA violations because, in order to make this determination, each script must be considered individually in its respective context.

In its remedies ruling, the district court listed fifteen CFA violations it found to be knowing, purposeful, and harmful to thousands of Iowans. The district court noted the "pronounced need to deter" future violations and ordered "a civil penalty in the highest amount, $40,000.00," for each violation. The designated violations relating to telemarketing solicitations included "risk free" representations, unintelligible telemarketing pitches, and the false claim "that any part of the transaction [wa]s intended as a 'thank you.'"

Vertrue does not dispute that 4451 members joined its Home Works Plus program as a result of the Home Works Plus telemarketing

script discussed earlier.  Nor does Vertrue dispute that 25,405 members joined the Simple Escapes program as a result of telemarketing pitches based on scripts similar to the one used to solicit Ackelson.  Our review of the Home Works Plus script and the telemarketing phone call to Ackelson demonstrate the civil penalties the district court ordered based on the three above-mentioned telemarketing practices were easily supported by the record without any reliance on exhibit 620.  Therefore, we decline to address Vertrue's arguments regarding the district court's reliance on exhibit 620.

4. *Dual cancellation requirement for bundled Internet membership sales.*  In the liability ruling, the district court reviewed evidence that in addition to posttransaction Internet marketing, Vertrue also maintained direct Internet marketing on its own Web sites.  As stated by the district court,

> Vertrue maintains its own website FreeScore.com, where the consumers can purchase a service involving credit scores. However, Vertrue bundles another distinct product, Privacy Plus, with the purchase of the initial service, for an additional monthly fee . . . .  Thus, to purchase the initial service, a consumer must purchase Privacy Plus, although this fact is obscured as much as possible. . . .  [T]here is no ambiguity that to cancel both services, a member must call two separate 800 numbers, even though the consumer had no choice but to purchase both services together.  Most consumers will likely be unaware of the purchase of the second service (much like the post-transaction solicitations discussed above), and that when the consumer calls an 800 number to cancel the primary service, he or she will continue to be billed for the (unknown) add-on service. Moreover, even for the wary consumer that understands that two services are being purchased with only one click of the mouse, such a consumer may not understand that calling one number to cancel does not cancel both services, despite the "one-click" nature of the initial purchase.

(Citations omitted.)

The testimony of Bruce Douglas, the vice president of marketing, during the liability trial demonstrates that the practice of bundling memberships in Internet transactions occurred precisely as described by the district court. The district court concluded that the practice violated the CFA and ordered remedies accordingly. Vertrue challenges the district court's rulings as to liability and the remedy in respect to the dual cancellation requirement. However, we review the record only to determine whether it supports the district court's award of a civil penalty based on the foregoing practice. Vertrue argues that its practice of requiring two separate cancellation phone calls for bundled Internet membership sales is not unfair or deceptive because "the two programs enrolled in through a single transaction were shown by separate entries on the consumer's credit card statement [and e]ach entry provided the name of the program accompanied by a toll-free" cancellation phone number.

Douglas testified that the primary benefit of Privacy Matters 1-2-3 service on FreeScore.com was to provide "access to credit information and credit monitoring [of] your report and sending you alerts if anything should change with those reports." A liability trial exhibit showed the three browser pages viewed by consumers registering for the Privacy Matters 1-2-3 service on FreeScore.com. The first Web page enticed consumers to enroll in Privacy Matters 1-2-3 with a large, bright, and attractive display as well as a passage stating:

> **Sign up here** and along with your **FREE 7-day trial** in *Privacy Matters 1-2-3* you'll get instant, online access to your FREE **3-in-1 Credit Report and Triple Credit Scores.**
>
> *Privacy Matters 1-2-3* makes it easy to . . .
>
> - **Check that your information is accurate** with your 3-in-1 Credit Report and Triple Credit Scores.

- **Stay on top of your information** with Triple Credit Report Monitoring and daily alerts whenever critical changes occur in your credit file at all 3 credit bureaus.

- Other important benefits.

Nowhere on the browser page did the solicitation refer to the Privacy Plus membership or any other program that the consumer would be enrolled in by clicking the large, bright "START NOW" button.

The second browser page instructed the consumer as follows:

> **Step 1 of 2. Complete the form below.** (See **Offer Details.**) In addition to *Privacy Matters 1-2-3,* you'll also receive ***Privacy Plus\*.*** Click here for details.

Web form fields appeared below for consumers to enter their names and contact information.

Covertly, on the left-hand side of the second browser page, in fine print, the essential offer terms were set forth. In the reproduction introduced into evidence, the print in which these details are set forth is so tiny that it is nearly unreadable. The consumer is instructed that they will be charged a "$1.00 monthly refundable processing fee" to enroll in the Privacy Matters 1-2-3 "7-day FREE trial." The fine print goes on to explain that after seven days "it's just $29.95 per month." A toll-free number is provided, and the consumer is instructed to call and cancel within seven days to avoid charges.

A separate shorter paragraph of fine print below instructs the consumer that:

> By clicking "Submit" on the next page you also agree to activate your separate membership to *Privacy Plus* at the special low price of just $2.00 per month. To ensure continuous service, your membership will be automatically charged/debited each month at the then-current membership fee to the credit card you provide today or from the checking account associated with the debit card you provide today.

The passage further instructs the consumer to call a different toll-free number to cancel the Privacy Plus membership if the consumer is dissatisfied for any reason.

Another passage in the same fine print placed at the bottom of the browser page instructs the consumer that

> [p]articipating vendors are neither sponsors, co-sponsors nor affiliates of *Privacy Plus*. Gift card/certificate savings are an exclusive offer of *Privacy Plus* and are valid only on gift cards/certificates purchased through *Privacy Plus*. Please see back of gift card/certificate for terms and conditions of use. All vendor trademarks and copyrights remain the property of the individual vendor. *Privacy Plus* uses vendor names, logos and any other vendor material by permission of each vendor. Please visit the *Privacy Plus* website or call Member Savings for complete terms and conditions related to participating vendors.

This passage is the only opportunity on the three sign-up browser pages to consider information relating to the actual nature of the Privacy Plus program. Even in the unlikely event a consumer noticed and read the passage, the degree of vagueness employed would likely not permit an ordinary consumer to recognize that Privacy Plus was actually a buying club membership.[12]

The third browser page contained Web form fields for consumers to enter their payment information. Additionally, it contained more colorful and enticing endorsements of Privacy Matters 1-2-3 in large legible print. Below the Web form fields, the fine print returned in a passage that stated:

> Typing my e-mail address below will constitute my electronic signature and is my written authorization to charge/debit my account according to the **Offer Details**. By clicking

---

[12]The district court ruled that Vertrue's privacy programs did not qualify as buying club memberships. As discussed above in part II.F., we disagree with the district court's conclusion that the sale of the Privacy Plus program in this context did not constitute the sale of a buying club membership.

"Submit", I have read and agree to the *Privacy Matters 1-2-3* and *Privacy Plus* Offer Details on the previous page and the <u>Privacy Policy</u> and <u>Terms and Conditions</u> for both programs.

As the district court stated, information indicating that the purchase of the Privacy Matters 1-2-3 program would also result in a simultaneous purchase of the separate Privacy Plus program was "obscured as much as possible." The covert fine print setting forth the dual nature of the transaction was misleading. The design, content, and layout of the sign-up browser pages created an overall net impression that consumers were purchasing one program for the purpose of monitoring their credit scores. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1067–68 (C.D. Cal. 2012) (finding Internet solicitation to be unfair and deceptive when, *inter alia,* a "disclosure—by its placement, wording, colorization, spacing, and size of the text—was designed not [to] be clear and conspicuous, but rather to mask information . . . without entirely omitting the information"). The similarity in the names of the two programs suggested that Privacy Plus was a related component of the program in which the consumer was initially interested.

However, the deception did not end there. The fact that the consumer was required to call a separate number to cancel Privacy Plus appears only once in fine print. Thus, even the hypervigilant consumer that recognized he or she had enrolled in two memberships simultaneously could still be easily misled into thinking that by calling to cancel the initial membership, both memberships would be canceled. There is no question as to whether the information obscured by Vertrue in a misleading fashion was material. The information regarding the enrollment in Privacy Plus and the procedure for cancellation constituted essential terms of the offer with attendant performance obligations.

Accordingly, we conclude Vertrue's practice of requiring dual cancellation requests for memberships bundled into a single Internet transaction was deceptive in violation of section 714.16(2)(*a*). Additionally, this scheme was an unfair practice because it was likely to result in unavoidable injury to consumers who did not realize by purchasing one service they were obligating themselves to pay a monthly premium for a separate membership. Again, we are unable to identify any attendant consumer or competitive benefits justifying this practice.

Vertrue also relies on the voluntary payment doctrine set forth in *Spivey*, 622 F.3d at 822, in support of its argument that it was not unfair or deceptive to require separate cancellation of "memberships through means that were readily identifiable on credit card billings." We rejected Vertrue's invocation of the voluntary payment doctrine in the context of BCL reimbursement and see no reason to reach a different result here. Accordingly, we affirm the district court's liability finding and the civil penalty ordered for the practice of requiring dual cancellation requests for memberships bundled into a single Internet transaction.

### V. Consumer Frauds Committed Against the Elderly.

The State sought additional civil penalties for consumer frauds committed against the elderly under section 714.16A. The district court ruled against the State on this issue, concluding

> the State has failed to carry its burden of proof that the Vertrue [defendants] have targeted older Iowans . . . . Vertrue has attempted to take advantage of all consumers equally, and [has] not directed its efforts against any age group.

The State has cross-appealed this issue. Our review of this equity ruling is de novo; however, we review the district court's interpretation of

section 714.16A for correction of errors at law. *See Iowa Film*, 818 N.W.2d at 217.

Section 714.16A reads as follows:

> 1. If a person violates section 714.16, and the violation is committed against an older person, in an action brought by the attorney general, in addition to any other civil penalty, the court may impose an additional civil penalty not to exceed five thousand dollars for each such violation. . . .
>
> . . . .
>
> 2. In determining whether to impose a civil penalty under subsection 1, and the amount of any such penalty, the court shall consider the following:
>
> *a.* Whether the defendant's conduct was in willful disregard of the rights of the older person.
>
> *b.* Whether the defendant knew or should have known that the defendant's conduct was directed to an older person.
>
> *c.* Whether the older person was substantially more vulnerable to the defendant's conduct because of age, poor health, infirmity, impaired understanding, restricted mobility, or disability, than other persons.
>
> *d.* Any other factors the court deems appropriate.
>
> 3. As used in this section, "older person" means a person who is sixty-five years of age or older.

Iowa Code § 714.16A.

Subsection (*d*) authorizes the court to consider whether the merchant targeted the elderly if the court considers this to be an "appropriate" factor. *See id.* § 714.16A(2)(*d*). However, "targeting" implies intentional conduct and there is no legitimate statutory basis for concluding that the State must carry the burden of showing the elderly were intentionally targeted. Imposing this burden on the State is in direct contravention of subsections 2(*a*) and (*b*), which expressly direct the court to consider levels of culpability equivalent to those required for a showing of recklessness or negligence. *Compare id.* § 714.16A(2)(*a*) (directing the court to consider "[w]hether the defendant's conduct was in

willful disregard of the rights of the older person"), *and id.* § 714.16A(2)(*b*) (directing the court to consider "[w]hether the defendant knew or should have known that the defendant's conduct was directed to an older person"), *with Peter v. Thomas*, 231 Iowa 985, 992, 2 N.W.2d 643, 646–47 (1942) ("We think our court has held to the true rule heretofore that to constitute recklessness there must be shown a conscious disregard of the rights of others . . . ." (Citation and internal quotation marks omitted.)), *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004) ("In order to prove negligent supervision, a plaintiff must show: (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct . . . ."), *and Morgan v. Perlowski*, 508 N.W.2d 724, 728 (Iowa 1993) (affirming trial court's denial of motion notwithstanding the verdict in which, *inter alia*, "a jury issue was generated as to whether [defendant] knew or should have known he had the ability to control the person or persons causing injury").

In drafting subsection (2), the legislature employed language that invokes traditional legal standards with definitions commonly assigned in our jurisprudence. *See Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 319 (Iowa 2013) (interpreting sexual predator commitment statute and concluding that the legislature "attached to the words 'relevant and reliable' meanings commonly assigned to them in our jurisprudence"). Accordingly, we conclude the legislature has directed the court to consider whether the conduct challenged under section 714.16A evinced negligent or reckless indifference to the rights of elderly Iowans. Reading a requirement of intentional targeting into section 714.16A would defeat legislative intent.

On our de novo review, we conclude the State made the showing necessary to prove liability under section 714.16A. The State presented compelling evidence that Vertrue's marketing practices disproportionately affected elderly Iowans. The State constructed statistical databases by cross-referencing information obtained from Vertrue in discovery, with motor vehicle division, social security, and background investigation databases. These statistical calculations demonstrated that of the fifty direct mail enrollees who had the most billings with no incidence of benefit usage, forty-six percent were over the age of sixty-five. The corresponding figure was thirty-one percent for Internet enrollees, thirty percent for outbound telemarketing enrollees, and fifty-two percent for inbound telemarketing enrollees. Additionally, the State's calculations demonstrated that persons aged sixty-five or older constituted fifty percent of all Iowa members that were billed ninety or more times without ever using program benefits. Clearly, the elderly were overrepresented in these statistical populations. State Data Center figures indicated that about nineteen percent of all Iowans were sixty-five or older during the relevant time frame.

Vertrue has not attempted to refute the accuracy of the State's statistical evidence but, rather, has repeatedly argued it did not direct its marketing plans at the elderly, and programs were not designed to appeal to a specific age group. The gist of all of Vertrue's arguments regarding liability under section 714.16A is that they did not violate the statute because they did not target the elderly. These arguments miss the mark.

In addition to reviewing the State's statistical evidence, the district court acknowledged that contrary to the "trial testimony of Jeff Paradise, [the Vice President of Product], who stated that age was not discussed[,]

internal company documents include demographic studies that examine age data extensively." One study conducted by Vertrue demonstrated 19.4% of enrollees in its Privacy Matters 1-2-3 program who never used any program benefits were over the age of sixty-five. This was the third highest percentage for any age group. However, persons in the over-sixty-five age group only constituted 15.8% of one-time benefit users. The corresponding figure for persons in the over-sixty-five age group who were two-time benefit users plummeted to 6.3%—the lowest figure for all age groups except the under-twenty-five age group. These figures demonstrated that persons over the age of sixty-five were among the most likely to enroll in the program and among the least likely to use the program benefits. Again, the weight of the evidence suggests that these persons never accessed the purported membership benefits because they did not know they were deceived into enrolling. An accompanying internal report noted that, "Almost half (46%) of the Privacy Matters visitors are age 55 or more . . . . The biggest skew is in visitors over age 55." Not only did Vertrue have access to the information necessary to generate the statistics produced by the State, to some extent, they actually did. Accordingly, the trial record demonstrates that Vertrue, at the very least, should have known that their fraudulent strategies disproportionately affected the elderly.

Additionally, the record was replete with testimony of Iowans over the age of sixty-five who testified they could not read important disclosures contained in Vertrue's marketing and program materials because their vision, compromised by old age, rendered the fine print illegible. This testimony is corroborated by extensive record evidence. Common sense dictates that, similarly, the elderly were substantially more vulnerable to Vertrue's indecipherable, rapid-fire telemarketing

pitches due to the auditory deficiencies that disproportionally affect the elderly.

The State convincingly carried the burden set forth by the statutory factors in section 714.16A(2). We will not read an intent requirement into the statute that would undermine the statute's self-evident goal of protecting Iowa consumers who are vulnerable to unfair sales tactics because of their age. For these reasons, we reverse the district court finding that Vertrue did not violate section 714.16A. As discussed above, pursuant to section 552A.5 of the BCL, a BCL violation is a violation of section 714.16(2)(*a*). Therefore, under section 714.16A, the State is entitled to civil penalties for CFA as well as BCL violations. The district court identified fifteen CFA violations and 104 BCL violations for the purposes of awarding civil penalties. Upon our de novo review, we increase the district court's award of civil penalties by $180,000 for a total of $3,000,000 in civil penalties for BCL and CFA violations.

## VI. Conclusion.

We affirm the district court's rulings regarding the applicability of the BCL to Vertrue's mail, telephone, and Internet solicitations. Likewise, we affirm the district court's ruling that application of the BCL to Vertrue's solicitations does not violate the dormant Commerce Clause. We reverse the district court's ruling regarding the applicability of the BCL to Vertrue's financial, privacy, and health programs. Additionally, we reverse the district court's interpretation of section 714.16(7) of the CFA to the extent it requires the State to prove additional common law fraud elements in order to obtain a reimbursement award for BCL violations. We affirm the reimbursement award for BCL violations as modified. We also affirm the district court's ruling that there was sufficient evidence to support a finding of CFA violations based on

Vertrue's telemarketing and Internet practices. Finally, we reverse the district court's ruling that the State was not entitled to civil penalties for consumer frauds committed against the elderly and enhance the award of civil penalties accordingly.

**AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED.**

All justices concur except Mansfield, J., who takes no part.